**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**THE STATE OF NEW YORK,**

|                        | **Plaintiff,** | **1:07-CV-1003** |
|                        |                | **(GLS/DRH)** |

**v.**

**KATHLEEN SEBELIUS,** _Secretary of_
_the Department of Health and Human_
_Services_**; MICHAEL ASTRUE,**
_Commissioner of Social Security_**,**

                                    **Defendants.**
_____

**APPEARANCES:**                    **OF COUNSEL:**

**FOR THE PLAINTIFF:**

Hon. Andrew M. Cuomo              JEFFREY M. DVORIN, ESQ.
New York Attorney General         SHOSHANAH V. BEWLAY, ESQ.
The Capitol
Albany, NY 12224

**FOR THE DEFENDANTS:**

U.S. Department of Justice        JOEL MCELVAIN, ESQ.
Civil Division
Federal Programs Branch
20 Massachusetts Avenue, N.W.
Room 7130
Washington, DC 20001

**Gary L. Sharpe**
**U.S. District Judge**

1

## DECISION AND ORDER

### I. Introduction

This action arises out of the Social Security Administration's ("SSA") failure to make proper Title II eligibility determinations since at least 1973, resulting in the inappropriate expenditure of State funds on Medicaid and State supplementary payments.  Presently pending is defendants' motion to dismiss under FED. R. CIV. P. 12(b)(1) and (6).  For the reasons that follow the motion is granted in part and denied in part.

### II. Background

**A.    Statutory Background**

This case involves four programs created under the Social Security Act (the "Act"): the federal Social Security disability insurance program ("SSDI"), administered under Title II of the Act, 42 U.S.C. § 401, *et seq*.; the federal supplemental security income program ("SSI"), administered under Title XVI of the Act, 42 U.S.C. § 1381, *et seq*.; the federal Medicare program, administered under Title XVIII of the Act, 42 U.S.C. § 1395, *et seq*.; and the joint federal/state Medicaid program, administered under Title XIX of the Act, 42 U.S.C. § 1396, *et seq*.  It is necessary to briefly highlight

aspects of each of these programs to lend clarity to the factual circumstances of this case.

### 1. SSDI

SSDI is a federally funded cash benefit paid to persons "under a disability" who have "insured status" at the time of the disability's onset. *See* 42 U.S.C. §§ 423(a), (c); 20 C.F.R. § 404.131.  To demonstrate "insured status" a claimant must have earned wages in a sufficient number of recent quarterly periods to qualify as an insured individual.  *See* 42 U.S.C. § 423(c)(1).  Qualification for SSDI does not turn on a showing of financial need.  *See* 42 U.S.C. § 423.  The SSDI program is administered by SSA.  (*See* Compl. at ¶ 9; Dkt. No. 1.)

### 2. SSI

SSI is designed to assist aged, disabled and blind persons by setting a minimum guaranteed income for such persons.  *See* 42 U.S.C. § 1381.  The program is administered by SSA.  Unlike SSDI, qualification for SSI is dependant on the claimant's income and financial resources.  *See* 42 U.S.C. § 1382(a).  SSDI is considered to be "income" for determining a claimant's need for SSI benefits.  *See* 42 U.S.C. §§ 1382(a); 1382a(a)(2)(B).  As such, an SSDI award may reduce or eliminate the SSI

3

award the claimant receives.  *See id.*  An individual is ineligible for SSI if, after being informed of Title II eligibility, the individual fails to apply for Title II benefits.  *See* 42 U.S.C. §§ 1382(a), (e)(2); 1382a(a)(2)(B).  As a matter of policy, SSA has chosen to treat SSI applications as an application for SSDI benefits under Title II.  (*See* Compl. ¶ 27; Dkt. No. 1.)  *See* Social Security Administration Program Operations Manual System ("POMS") § GN00204.027.

In addition to federal SSI benefits, many States, including New York provide optional State supplementary payments ("SSP") to eligible citizens.[1]  *See* 42 U.S.C. § 1382e.  All New York residents eligible for SSI are also eligible for SSP.  *See* 42 U.S.C. § 1382e(b).  While SSP programs are optional, once a State has established such a program eligible individuals are legally entitled to SSP.  (*See* Compl. ¶ 12; Dkt. No. 1.) Pursuant to a statutorily authorized "1616 agreement" SSA administers New York's SSP program and makes payments thereunder.  *See* 42 U.S.C. § 1382e(b).  New York reimburses SSA for these payments and pays an additional administrative fee for each payment disbursed.  *See* 42

---

[1]States are also required to make "mandatory minimum" supplemental payments to maintain State assistance levels for people who received such assistance prior to the enactment of the SSI program in 1974.  *See* Pub. L. No. 93-66, § 212, 87 State. 152, 156 (1973).

U.S.C. § 1382e.  The terms of the 1616 agreement are dictated by federal law and require SSA to, *inter alia*, make SSP eligibility determinations and identify and recover SSP overpayments.  (*See* Compl. Ex. 1; Dkt. No. 1.)

### 3. Medicare

Medicare is a federal health insurance program for the aged and certain disabled people which is administered by the Department of Health and Human Services through the Centers for Medicare and Medicaid Services (collectively "HHS").  *See* 42 U.S.C. § 1395, *et seq*.  Persons who have been entitled to SSDI for 24 months are eligible for Medicare.  *See* 42 U.S.C. §§ 426(b); 1395c.  Eligibility for Medicare does not turn on a showing of financial need.

The original Medicare program consists of two basic parts, the Hospital Insurance Benefits program established under Part A of the Act and the Supplementary Medical Insurance program established under Part B of the Act.  *See* 42 U.S.C. §§ 1395c, *et seq*.; 1395j, *et seq*.  Under Part A the federal government covers "provider" (i.e., institutional) services.  *See* 42 U.S.C. §§ 1395d(a); 1395f(a); 1395x(u).  Only a "provider of services" - which includes hospitals, skilled nursing facilities and similar facilities - has the right to seek payment for Part A services, and such payment can only

5

be made upon the provider's filing of a proper claim.  *See* 42 U.S.C. §§ 1395f(a)(1); 1395x(u); 42 C.F.R. §§ 424.33, 424.51.

Medicare Part B establishes a voluntary supplemental insurance program which generally covers outpatient services and "medical and other health services."  *See* 42 U.S.C. §§1395j; 1395k(a).  Medicare Part A recipients may elect to enroll in Part B upon the payment of a monthly premium.  *See* 42 U.S.C. §§ 1395o; 1395s.  Additionally, many States, including New York, have entered into "State Buy-In Agreements" with HHS through which certain "coverage groups" among the State's Medicare-eligible residents - such as SSI recipients - are enrolled in Part B.  *See* 42 U.S.C. § 1395v(a), (b).  Under the Buy-In Agreement the State commits to paying the monthly Part B premiums on behalf of these enrollees.  *See* 42 U.S.C. § 1395v(d)(1).  Coverage is supposed to begin "the first day of the first month in which [the individual] is both an eligible individual and a member of a coverage group specified in the agreement."  *See* 42 U.S.C. § 1395v(d)(2)(C).

Only a "provider of services," a "supplier" (i.e. physicians, other practitioners and entities other than a "provider of services"), or, rarely, a Part B beneficiary may file a claim and receive payment from Medicare for

6

Part B services.  *See* 42 U.S.C. §§ 1395l(e), 1395n; 42 C.F.R. §§ 424.33, 424.34, 424.53, 424.55.

### 4. Medicaid

Medicaid is a joint federal/state funded program federally administered by HHS which provides medical assistance to individuals whose income and financial resources are insufficient to meet the costs of necessary medical services.  *See* 42 U.S.C. § 1396, *et seq*.  States that participate in the program, such as New York, are required to comply with the requirements of the Medicaid statutes and regulations, which includes providing all SSI recipients with Medicaid coverage.  *See* 42 U.S.C. § 1396a(a)(10)(A)(i)(II); *Harris v. McRae*, 448 U.S. 297, 301 (1980).  New York and HHS have entered into a statutorily authorized "1634 Agreement" under which HHS or its delegee - now SSA - is obligated to make Medicaid eligibility determinations on behalf of the State, make Medicaid redeterminations as often as SSI or SSP redeterminations are made, and provide the State with information regarding such redeterminations.  *See* 42 U.S.C. § 1383c (*See also* Compl. Ex. 2; Dkt. No. 1.)

The Medicaid program is intended to be a payer of last resort.  Thus the State Medicaid agency is required to take "all reasonable measures to

ascertain the legal liability of third parties" for care available under Medicaid.  *See* 42 U.S.C. § 1396a(a)(25)(A).  Where probable third party liability is established before a Medicaid claim is paid out, the State Medicaid agency must "reject the claim and return it to the provider."  *See* 42 U.S.C. § 1396a(a)(25)(A); 42 C.F.R. § 433.139(b).  Where third party liability is not established until after the Medicaid claim is paid out, the State Medicaid agency must seek reimbursement from the third party "to the extent of such legal liability" if the recovery efforts may reasonably be expected to be cost effective.  *See* 42 U.S.C. § 1396a(a)(25)(B); 42 C.F.R. § 433.139(d).

## B.   Factual Background

At some point between 1990 and 1995 SSA learned that systematic problems were precluding it from properly ascertaining eligibility of individuals for SSDI benefits under Title II.  (*See* Compl. ¶¶ 48, 49; Dkt. No. 1.)  Such problems involved serious deficiencies in obtaining and entering appropriate SSI recipient information into SSA databases, as well as computer errors in retrieving such information.  *Id*.  Accordingly, for periods going back as far as 1973, large numbers of individuals were deprived of Title II benefits to which they were entitled, being afforded only SSI

8

benefits.  *Id.* at ¶ 50.  As a result, many of these individuals received larger SSI and SSP benefits than they would have had their Title II eligibility been properly determined.  *Id*.  Additionally, many SSI recipients who should have been covered by Medicare due to SSDI eligibility were not, causing Medicaid to improperly cover such individuals health care costs.  *Id*. at ¶ 61.

In 2001, SSA established a national database of those SSI beneficiaries who had been potentially eligible for, but did not receive, Title II SSDI benefits.  *Id*. at ¶ 52.  The database, which is known as the Special Disability Workload ("SDW"), was assembled as part of the process of identifying and tracking those individuals affected, determining whether they were eligible for Title II benefits retroactively, and making some recompense for errors if they were eligible.  *Id*. at ¶ 53.  Under SSA's procedure for addressing the SDW, the agency identifies individuals for whom sufficient information exists in SSA databases to make an "informal" determination that they are or were eligible for SSDI.  *Id*. at ¶ 66.  Multiple notifications are then sent to such individuals notifying them that they must apply for SSDI benefits or lose SSI eligibility.  *See* POMS § SI00510.031; *see also* 42 U.S.C. § 1382(e)(2).  However, the notice does not refer to the

SDW or to the fact that erroneous eligibility determinations may have been made.  (*See* Compl. ¶ 66; Dkt. No. 1.)  Where SSA receives a new application, determines retroactive Title II eligibility and makes payments as are consistent with that retroactive eligibility, it is crediting States with SSP improperly paid as a result, as required under 42 U.S.C. § 1320a-6. *Id*. at ¶ 71.  The remaining cases are closed without further action.  *Id.* at ¶ 66.

Determination that an individual is entitled to retroactive SSDI for at least 24 months is effectively a determination that they were also eligible for Medicare.  *See* 42 U.S.C. §§ 426(b); 1395c.  Accordingly, where SSA has determined that an individual is retroactively entitled to Title II benefits it has informed HHS.  (*See* Compl. ¶ 72; Dkt. No. 1.)  HHS has then retroactively charged New York Medicaid agencies Part B premiums pursuant to the Buy-In Agreement.  *Id*. at ¶ 73.  However, SSA and HHS have failed to reimburse the State for expenses which should have been covered by Medicare, but were instead paid, at least in part, through State Medicaid funds.  *Id*. at ¶¶ 74-76.  Further, neither SSA or HHS have made redeterminations as to the eligibility for Medicaid of those individuals retroactively eligible for SSDI benefits, regardless of whether they submit

new SSDI applications and despite the requirements of the 1634

agreement.  *Id*. at ¶ 77-78.

Upon learning of the flaws in SSA's SSDI eligibility determination

process, New York took steps to assess the effects of the problem on the

State.  *Id.* at ¶ 58.  Based on an audit report issued by the NYS Office of

Temporary Disability Assistance ("OTDA Report"), New York estimates that

the expenses it incurred as a result of the federal errors exceeded $81

million in SSP and administrative fees, $1.7 billion in Medicaid

overpayments, $9 million in public assistance payments, and $13 million in

other expenses.  (*See* OTDA Report, Compl. Ex. 3.; Dkt. No. 1.)  It also

found that the federal government had grossly underestimated the number

of individuals within the State affected, that the SDW project was

inadequate to address the problem, and that the flaws which led to the

issue may still exist.  *Id*.  New York officials have made numerous efforts to

resolve these issues with HHS and SSA with no success.  (*See* Compl. at

¶¶ 99-103; Dkt. No. 1.)

This action ensued, with the State invoking the court's jurisdiction

under 28 U.S.C. §§ 1331; 1361; 1346(a)(2) and 42 U.S.C. § 405(g).  (*See*

Compl. ¶ 5; Dkt. No. 1.)  Claims are asserted against SSA for breach of

11

contract and violation of due process; and against SSA and HHS for failure to fulfill statutory obligations; violations of the Administrative Procedure Act, 5 U.S.C. § 706; and breach of fiduciary duties.  *Id*. at ¶¶ 105-136.  In essence, the State seeks the following relief: (1) expansion and improvement of the SDW process; (2) a declaration that SSA must make retroactive SSDI determinations for all individuals in the SDW, not only those who submit a new application; (3) an expansion of the categories of financial loss for which the State will be reimbursed to include, among other things, administrative fees it paid SSA; (4) a declaration that SSA must make redeterminations of retroactive Medicaid and SSI eligibility for those erroneously denied SSDI and inform the State of such redeterminations; (5) an order requiring HHS to "adjust" Medicare and Medicaid accounts for individuals who were erroneously denied SSDI and Medicare benefits; and (6) an order enjoining HHS from charging the State Part B premiums for individuals who were erroneously covered under Medicaid, and the return of any such premiums already paid.  *Id.* at pp. 40-44.  Currently pending is HHS and SSA's motion to dismiss pursuant to FED. R. CIV. P. 12(b)(1) and (6), on grounds that New York's claims are barred by principles of sovereign immunity and fail to state claims upon which relief can be

12

granted.  (*See* Dkt. No. 13.)

## III.  Standard of Review

The court has previously addressed the standards for dismissal pursuant to Rules 12(b)(1) & (6), and need not repeat those standards here.  For a full discussion of the standards, the court refers the parties to its decisions in *Stanley v. Community Bank, N.A.*, No. 8:08-CV-925, 2009 WL 261333, at *1-2 (N.D.N.Y. Feb. 4, 2009) (12(b)(1) standard) and *Dixon v. Albany County Bd. of Elections*, No. 1:08-CV-502, 2008 WL 4238708, at *2 (N.D.N.Y. Sept. 8, 2008) (12(b)(6) standard).

## IV.  Discussion

### A.    Sovereign Immunity

Initially, SSA and HHS contend that the only potentially applicable waiver of sovereign immunity here - that found in § 702 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 - is not satisfied because the State seeks relief in the nature of monetary damages.  Thus it is argued that dismissal of this action is required, as the court lacks jurisdiction.[2]

---

[2]It should be noted that despite the State's failure to pursue this action at the administrative level, SSA does not seeks dismissal for failure to comply with the judicial review provisions of 42 U.S.C. § 405(g) & (h).

It is well established that "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit*." F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994).  One such waiver of sovereign immunity is found in § 702 of the APA, which provides:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief *other than money damages* and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702 (emphasis added).  Despite the language of this provision, it has been recognized that not all suits seeking a monetary award fall outside the waiver.  As the Supreme Court has explained, Congress used the term "money damages" in § 702 "to distinguish between specific relief and compensatory, or substitute, relief."  *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999).  Thus, where a party seeks "the very thing to which he [is statutorily] entitled," the remedy cannot be deemed to be in the nature of damages and § 702 will apply, even if the end result will be the payment of money.  *Bowen v. Massachusetts*, 487 U.S. 879, 895 (1988).

14

In *Bowen*, for example, the Supreme Court found § 702 applicable to a

State claim for reimbursement under the Medicaid Act, holding that the

State's suit was not "seeking money in *compensation* for the damage

sustained by the failure of the Federal Government to pay as mandated;

rather, it [was] a suit seeking to enforce the statutory mandate itself, which

happens to be one for the payment of money."  *Id*. at 900.

In the present instance, the State does not appear to dispute that, at

bottom, it seeks money from SSA and HHS.  However, it contends that, as

in *Bowen*, it seeks no more than that to which it is statutorily entitled, and

thus may rely on the waiver provided by § 702.  As to SSA, the State

asserts that it is merely attempting to enforce 42 U.S.C. § 1320a-6, which

governs the reimbursement of SSP overpayments where SSA makes

retroactive Title II payments to beneficiaries.  Regarding HHS, the State

contends that this suit seeks only to enforce the statutory mandate of 42

U.S.C. § 1396a(a)(25), which requires the State to pursue reimbursement

for improper Medicaid payments from potentially liable third parties.  In

response, SSA and HHS contend that they are already complying with their

statutory duties, and that the State's suit is impermissibly seeking

wholesale reimbursement for administrative fees, Medicare Part B

15

premiums, and SSP and Medicaid overpayments, outside the mandate of any statutory authority.  As the court discusses, *infra*, there is some merit to SSA and HHS's arguments.  However, the action will not be wholly dismissed for lack of jurisdiction, though the potential relief available to the State will be more limited than that it seeks.

**B.   APA and Breach of Statutory Duties Claims against SSA (Counts I and II)**

As mentioned above, the parties' dispute in regards to the State's first and second claims predominantly centers on the scope of the relief the State is entitled to under 42 U.S.C. § 1320a-6, pursuant to which the SDW project has been undertaken.  The State contends that the manner in which SSA is addressing the SDW is arbitrary and capricious and in violation of its statutory duties under § 1320a-6.  It is asserted that "[t]he central flaw in the SDW process is that it limits retroactive Title II eligibility determinations to only those individuals who file a new Title II application after receiving notice from SSA."  According to the State, this process will exclude large numbers of individuals who should be receiving retroactive Title II benefits, and correspondingly denies the State significant SSP reimbursements.  Thus, the State argues that SSA should be required to make retroactive

SSDI determinations based on existing information without making

individual eligibility determinations.  Additionally, the State seeks an

expansion of the time frame and individuals encompassed by the SDW,

and a refund of administrative fees paid to SSA.

In relevant part, 42 U.S.C. § 1320a-6(a) provides that:

in any case where an individual – (1) is entitled to [Title II
benefits] that were not paid in the months in which they were
regularly due; and (2) is an individual ... eligible for [SSI and/or
SSP benefits] for one or more months in which the benefits
referred to in clause (1) were regularly due, then any [Title II
benefits] that were regularly due in such month or months ...
but have not been paid ... shall be reduced by an amount equal
to so much of the [SSI and SSP benefits] ... as would not have
been paid ... if [the individual] had received such [Title II
benefits] in the month or months in which they were regularly
due.

From the amount of this reduction in Title II benefits, § 1320a-6(c) directs

that SSA:

shall reimburse the State on behalf of which supplementary
payments were made for the amount (if any) by which such
State's expenditures on account of such supplementary
payments for the month or months involved exceeded the
expenditures which the State would have made (for such month
or months) if the individual had received [Title II benefits] at the
times they were regularly due.

Contrary to the State's contention, these provisions clearly contemplate an

individual determination of retroactive Title II eligibility and a corresponding

17

adjusted Title II benefit payment before the State can be reimbursed for any excess SSP payment.  This plain reading of the statute is supported by 20 C.F.R. § 404.902(r), which provides that agency decisions to reduce retroactive Title II payments by the amount of past overpayments of SSI and SSP are initial determinations which the beneficiary may challenge through further agency and judicial review. *See also* 20 C.F.R. § 404.408b (indicating retroactive Title II benefits will be reduced by the amount of SSP overpayment).

The court is not convinced by the State's contention that it may gain aggregate SSP reimbursement because the CFR previously provided for federal liability where SSA's error rate for incorrect supplementary payments exceeded a national error rate.  *See* 20 C.F.R. § 416.2086 (1983).  This provision was revoked in 1984, and SSA has provided that it will no longer be liable for erroneous SSP.  *See* 49 Fed. Reg. 38,247, 38,248 (Sept. 28, 1984).  Clearly, a defunct regulation cannot be enforced, especially where it is replaced by a provision expressly disavowing obligations under the prior section.  Nor would a suit for reimbursement under a repealed regulation be in the nature of specific relief such that the waiver of § 702 would apply.  As such, the court rejects the State's

assertion that it is entitled to wholesale reimbursement for estimated SSP

overpayments.  Rather, pursuant to 42 U.S.C. § 1320a-6, the State is due

SSP reimbursement only where SSA determines that an individual is

eligible for retroactive SSDI payments and received excess SSP payments

as a result.[3]

However, the seemingly overbroad nature of the relief sought by the

State does not mandate the complete dismissal of the first and second

causes of action.  FED. R. CIV. P. 54(c) allows the court to shape the relief

to conform to that which the plaintiff is entitled.  Here, much of the relief

sought in the complaint can potentially be fashioned to comport with the

contours of § 1320a-6.  Specifically, the first and second claims survive

within the confines of § 1320a-6 insofar as the State takes issue with the

scope of the SDW project in terms of the time frame it covers and the

individuals it encompasses.  As SSA considers an application for SSI

benefits to be an application for Title II benefits it clearly has a duty to

determine whether an SSI applicant is entitled to Title II benefits, even if

that determination is made retroactively.  *See, e.g.,* 42 U.S.C. §§ 405(b)(1),

---

[3]Additionally, the Court rejects the State's attempt to gain reimbursement of administrative fees paid to SSA under its 1616 agreement, as no statutory provision is cited which would qualify such recovery as specific relief within the meaning of § 702.

1383(c); Social Security Administration Program Operations Manual

System ("POMS") § GN00204.027.  SSA has sought to honor this

obligation through the SDW.  Yet, New York's OTDA report concluded that

the methodology for including individuals in the SDW is flawed, and that the

systemic errors which led to the incorrect eligibility determinations may still

exist.  (*See* OTDA Report, Compl. Ex.3; Dkt. No. 1.)  Thus, it is possible

that certain aspects of the SDW project must be expanded or improved so

that SSA is making individual retroactive Title II determinations in an

adequate manner.[4]  Under such a scenario, any additional monetary

reimbursement received by the State would be in the nature of specific

relief, and thus would not offend § 702.  Simply stated, however, issues

regarding the scope and sufficiency of the SDW project are beyond the

ambit of the current motion.  Further, the extent to which SSA is already in

possession of sufficient information to make retroactive Title II

determinations cannot be properly addressed on a motion to dismiss,

_____

[4]SSA contends the State has failed to satisfy the *Twombly* standard insofar as it challenges the scope of the SDW project, because the complaint is devoid of allegations which would clarify which persons should be in the database but are not.  (*See* Def. Br. at 23 n.9; Dkt. No. 13:2.)  The Court cannot agree.  The complaint recites various provisions of New York's OTDA Audit Report which explain deficiencies in the SDW's process for identifying individuals potentially eligible for retroactive Title II benefits.  (*See* Compl. ¶¶ 60, 63, 64, 65; Dkt. No. 1, *see also* OTDA Audit Report at, e.g., 4-6, Compl. Ex. 3; Dkt. No. 1.)

despite SSA's statutory and regulatory exposition regarding the differences in qualification criteria for SSI and SSDI.  Thus, further factual development is necessary to address whether SSA is acting arbitrarily and capriciously or inconsistently with its statutory duties to the State under 42 U.S.C. § 1320a-6.  Accordingly, the State's first and second claims will not be dismissed at the current juncture.

## C.   APA and Breach of Statutory Duties Claims against HHS (Counts III and IV)

During the SDW process SSA has identified many individuals who were receiving SSI, and were thus covered by Medicaid, who should have been receiving SSDI benefits for at least 24 months, and accordingly should have been covered under Medicare.  According to the State these oversights have resulted in an estimated 1.7 billion dollars in improper State Medicaid payments.  Thus, the State argues that it is entitled to an "adjustment" of Medicaid and Medicare accounts (i.e. reimbursement of erroneous Medicaid disbursements) pursuant to 42 U.S.C. § 1396a(a)(25)(A).  It also seeks an order enjoining HHS from charging Part B premiums for individuals retroactively determined to Medicare eligible, and the restitution of such premiums as have already been paid.

As noted above, Medicaid is intended to be the payer of last resort. As such, 42 U.S.C. § 1396a(a)(25)(A) requires State Medicaid agencies to "take all reasonable measures to ascertain the legal liability of third parties ... to pay for care and services available under the plan."  Where "such a legal liability is found to exist after [Medicaid pays a claim] the State or local agency will seek reimbursement for such assistance *to the extent of such legal liability*."  42 U.S.C. § 1396a(a)(25)(B) (emphasis added).  Though this statute clearly imposes a duty on the State to seek Medicaid reimbursement, the court finds that it does not entitle the State to wholesale reimbursement from Medicare.

Initially, the court notes that "[t]he Medicare regulations carefully define who may file certain kinds of claims."  *Conn. Dept. of Soc. Servs. v. Leavitt*, 428 F.3d 138, 145 (2d Cir. 2005).   Pursuant to both statutory and regulatory authority, only providers or suppliers of services, and occasionally beneficiaries (as those terms are statutorily defined), are entitled to file a claim for payment with Medicare.   See 42 U.S.C. §§ 1395f(a); 1395n(a); 42 C.F.R. §§ 424.33, 424.34, 424.51, 424.53, 424.55. New York is not a provider of services or a supplier.  As such, the cited statutes and regulations do not explicitly allow it to file a claim directly with

22

Medicare.

Despite this, the State contends it may pursue its claims against HHS

pursuant to the case of *N.Y. State Dep't of Soc. Servs. v. Bowen*, 846 F.2d

129 (2d Cir. 1988).  In *N.Y. State Dep't of Soc. Servs.*, the State sought to

pursue administrative appeals as the statutory subrogee of 100

beneficiaries who had been denied Medicare benefits, and for whom State

Medicaid agencies paid for nursing services.  *Id.* at 131-32.  Because there

was no statutory or regulatory authority for such administrative appeals by

the State, HHS disallowed the administrative action.  *Id*.  On appeal, the

Second Circuit conceded that "the statute [and regulations] pertaining to

administrative appeals do[] not explicitly authorize a state agency to appeal

Medicare denials."  *Id*. at 133.  Instead, regulations permitted only a

beneficiary, his estate, or a service provider to file an administrative appeal.

*Id*.  Nonetheless, it was noted "that Medicare is a 'third party' for purposes

of the third party liability provisions, 42 U.S.C. § 1396a(a)(25)," and that,

despite its regulations, HHS had allowed "NYSDSS to pursue an appeal if it

obtain[ed] an authorization form signed by the patient or the patient's next

of kin."  *Id*. at 133-34.  Thus the Circuit found HHS's refusal to allow an

administrative appeal by the State on behalf of the beneficiaries to be in

defiance of common sense and inconsistent with the principle that
Medicaid is intended to be the payer of last resort.  *Id*.

This case is clearly distinguishable from *N.Y. State Dep't of Soc.
Servs*.  The State does not seek a mere extension of existing
administrative channels of recovery.  Instead it completely disavows
reliance on such channels, and seemingly demands wholesale relief
directly from Medicare in the absence of any specific statutory or regulatory
authority.  However far *N.Y. State Dep't of Soc. Servs.* may extend, the
court finds that it does not reach this far.  As mentioned, the State is
obliged to seek Medicaid reimbursement from third parties, including
Medicare, only "to the extent of such [entities'] legal liability."  42 U.S.C. §
1396a(a)(25)(B).  In order to find "such legal liability" here, the court would
be required to entirely scrap the administrative and statutory framework for
reimbursement, and permit a free floating right to aggregate compensation
from Medicare in the form of "account adjustments."  Such relief clearly
would not qualify as specific relief within the waiver of § 702.  Nor did the
Second Circuit intend to sanction such remedies with *N.Y. State Dep't of
Soc. Servs*.  Indeed, in the more recent case of *Conn. Dep't of Soc. Servs.
v. Leavitt*, 428 F.3d 138 (2d Cir. 2005), the Circuit rejected Connecticut's

24

contention that "if a provider fails to file a claim [with a Medicare intermediary],[5] then Connecticut, standing in the beneficiary's shoes, may do so." *Id.* at 144.  The Court explained that the State could not pursue such claims because beneficiaries themselves have no right to demand payment from Medicare intermediaries for provider services.  *Id.* at 144-45. Rather, "[w]hen Medicare covers services already paid for by Medicaid, Medicare pays the provider for the services, and *then Medicaid can seek reimbursement from the provider for Medicaid's initial erroneous payment*." *Id*. at 141-42 (emphasis added).

Thus, while the State may pursue claims against Medicare as the statutory subrogee of a beneficiary where the beneficiary could do so himself, the State may not completely circumvent statutory and regulatory channels to claim freestanding rights to compensation from Medicare.  This conclusion is buttressed by HHS regulations which expressly disavow liability for improper State Medicaid payments, stating, with exceptions not relevant here, that "[n]o [federal financial participation] is available in State

---

[5]The State seeks to distinguish *Conn. Dep't of Soc. Servs* on grounds that the issue there was the right to file a claim with Medicare intermediaries, not Medicare.  This is a distinction without a difference.  As the Circuit noted in *Leavitt*, "HHS ... oversees [Medicare intermediaries] and is ultimately responsible for [their] actions."  *See Conn. Dep't of Soc. Servs*, 428 F.3d at 142.

Medicaid expenditures that could have been paid for under Medicare Part B but were not because the person was not enrolled in Part B." *See* 42 C.F.R. § 431.625(d)(3); s*ee also* 20 C.F.R. § 416.2140 (stating that there is no federal liability for State financial loss suffered as a result of erroneous Medicaid determinations beyond the federal share of the Medicaid payment).  In sum, the State's claim for wholesale reimbursement for past Medicaid overpayments directly from Medicare finds no support in federal statutory or regulatory authority, and is thus barred by principles of sovereign immunity.

Despite the above, the court declines to dismiss the State's third claim insofar as it disputes its obligation to pay retroactive Part B premiums.[6]  HHS contends that the State is obligated to pay these premiums pursuant to its Buy-In Agreement, even though the individuals for whom such premiums are being charged did not receive Part B coverage.  However, this absurd result is not supported by any of the provisions cited by HHS.  42 U.S.C. § 1395v(d)(1) merely provides the mechanism by which the amount of the monthly Part B premium payment

---

[6]Nonetheless, the Court does reject the State's attempt to recover such retroactive Part B premiums as have already been paid, as no statutory provision is cited which would qualify such recovery as specific relief within the meaning of § 702.

26

is to be determined, while § 1395v(d)(2) & (3) and 42 C.F.R. § 407.47 indicate when an individual's coverage starts and finishes.  None of these provisions require the imposition of premiums based on retroactively determined Medicare eligibility where coverage was not provided.  Rather a common sense reading of these statutes and regulations indicate that Part B premiums are to be charged for months during which an individual is actually covered by Medicare Part B.  *See* 42 U.S.C. § 1395r(a)(2) ("The monthly premium of each individual *enrolled* under this part for each month... shall be the amount determined under paragraph (3)." (emphasis added)).  As such, the court will not defer to HHS's frankly ridiculous practice of charging the State retroactive Medicare Part B premiums, when Medicaid actually incurred the cost of coverage.

**D.**   **Breach of Fiduciary Duties and Breach of Contract Claims (Counts V and VI)**

Next, the State asserts a breach of contract claim arising out of SSA's alleged violation of the 1616 and 1634 agreements.  Additionally, it is contended that SSA and HHS have breached fiduciary duties imposed by these agreements and various statutes.  SSA and HHS argue that the court lacks jurisdiction over these claims because the State seeks in

27

excess of $10,000, such that the Little Tucker Act doesn't apply.  Further, it is contended that these counts fail to state a claim.

The Little Tucker Act provides district court jurisdiction over contractual and fiduciary claims against the federal government up to $10,000.  *See* 28 U.S.C. § 1346(a)(2).  For contractual claims seeking money in excess of that amount or equitable relief, the Tucker Act "impliedly forbids" district courts from exerting jurisdiction, rendering the remedies available in the Court of Claims exclusive.  *See Presidential Gardens Assocs. v. United States*, 175 F.3d 132, 141 n.3, 142-43 (2d Cir. 1999); *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 375-76 (2d Cir. 1999).  In deference to these principles, the State concedes that the court lacks jurisdiction over its breach of contract and contractually based fiduciary duty claims under the Little Tucker Act.  However, it is contended that the court may assert supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367.  The court cannot agree.  As defendants point out, the grant of jurisdiction found in § 1367 does not waive sovereign immunity.  *See Pershing Div. of Donaldson, Lufkin & Jenrette Sec. v. United States*, 22 F.3d 741, 743-44 (7th Cir. 1994); *Dia Nav. Co. v. Pomeroy*, 34 F.3d 1255, 1267 (3d Cir. 1994); *Smith v. State Univ. of N.Y.*,

28

No. 1:00-CV-1454, 2003 WL 1937208, at *7 (N.D.N.Y. Apr. 23, 2003).  Nor

can the waiver found in § 702 be relied upon in the context of a

contractually based claim against the federal government.  *See*

*Presidential Gardens Assocs.,* 175 F.3d at 142-43.  Thus, the court lacks

jurisdiction over the State's fiduciary and contractual claims to the extent

they arise out of the 1616 and 1634 agreements, and they must be

dismissed.[7]

Contrary to the situation where contractual claims are asserted

against the federal government, a plaintiff "may bring statutory and

constitutional claims for specific relief [against a governmental agency] in

federal district court," as such claims are beyond the jurisdiction of the

Court of Claims.  *See Transohio Sav. Bank v. Director, Office of Thrift*

*Supervision*, 967 F.2d 598, 610 (D.C. Cir. 1992).  Thus, the State has

recast its breach of fiduciary duty claim as arising from various statutory

provisions.  However, only two of these provisions are invoked with any

specificity- 20 C.F.R. § 416.2140 as against HHS and 42 U.S.C. § 1320a-6

---

[7]It should be noted that SSA and HHS continually request that the court dismiss claims on the merits even where it has no jurisdiction.  The court rejects these invitations, as a court without jurisdiction over a claim has no authority to pass on its merits.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

as against SSA.[8]   As such the court will focus its discussion on these

sections.

Initially, the court finds that it lacks jurisdiction over the State's

statutorily based breach of fiduciary duty claim as against HHS. Contrary to

the State's contention, 20 C.F.R. § 416.2140 does not mandate HHS

reimbursement for State Medicaid payments which should have been

covered by Medicare.  Rather it expressly disavows such a duty, stating:

> If the State suffers any financial loss, directly or indirectly,
> through using any information we provide under an agreement
> described in this subpart, we will not be responsible for that
> loss. However, if we erroneously tell a State that a person is
> eligible for Medicaid and the State therefore makes erroneous
> Medicaid payments, the State will be paid the Federal share of
> those payments under the Medicaid program as if they were
> correct.

20 C.F.R. § 416.2140.  Thus, HHS has not undertaken to pay the State's

portion of erroneous Medicaid expenditures.  Rather, HHS is obliged only

to contribute the federal portion of such Medicaid payments- an obligation

which it has satisfied in the present case.  Accordingly, the State's attempt

to seek reimbursement from HHS under § 416.2140 for the State's portion

---

[8]The other provisions cited are either redundant to the State's breach of contract claim, *see* 42 U.S.C. §§ 1382e, 1383c (authorizing 1616 and 1634 agreement), clearly fail to give rise to fiduciary duties to the State, *see* 42 U.S.C. § 405(g) (authorizing judicial review of administrative action); 42 U.S.C. § 1396a (requirements of State Medicaid plan), or impose obligations which have not been violated here, *see* 42 U.S.C. § 1396b (FFP for Medicaid).

of the erroneous Medicaid payments cannot be qualified as a request for specific relief.  Rather it is a prayer for damages.  As such damages would clearly exceed $10,000 dollars, the court has no jurisdiction to award it under the Little Tucker Act, nor does § 702 waive immunity for such a claim.

In regards to SSA, however, the breach of fiduciary duty claim must survive insofar as it is based in statute.  To the extent the State invokes SSA's obligations under § 1320a-6 to challenge the scope and sufficiency of the SDW project in making retroactive Title II determinations, the relief sought is specific, as discussed in Point B above.  Thus this aspect of the breach of fiduciary duty claim falls within the waiver of § 702 and the court has equitable jurisdiction over it.

In addition, SSA's contention that there are inadequate facts alleged in the complaint to state such a claim against it must be rejected.  A breach of fiduciary duty claim against the government requires allegations sufficient to satisfy three elements.  First, the State must "identify a substantive source of law that establishes specific fiduciary or other duties." *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003).  Second, it must allege a breach of that duty.  *Id*.  Third, it must show that the source of law

invoked "can fairly be interpreted as mandating" the relief sought.  *Id.*

Here, § 1320a-6 requires SSA to recover any State SSP overpayments

from a reduction in Title II benefits paid to individuals retroactively

determined to be entitled to such benefits.  It is alleged SSA has breached

this duty, inter alia, through inadequacies in the scope and sufficiency of

the SDW process, which has resulted in the exclusion of individuals

retroactively entitled to Title II benefits, as well as less SSP reimbursement.

Finally, insofar as improvement in the SDW process will result in more

retroactive Title II eligibility determinations and SSP overpayment

recoveries, § 1320a-6 in conjunction with other provisions can fairly be

interpreted as mandating such relief.  Accordingly, the court declines to

dismiss the State's breach of fiduciary duty claim against SSA to the extent

it is based in § 1320a-6.

### E.     *Parens Patriae* Claim against SSA (Count VII)

Finally, New York asserts a due process claim *parens patriae* on

behalf of its citizens, whom the State claims have been deprived of due

process by SSA's failure to expand the time period and individuals

encompassed by the SDW; refusal to make retroactive SSDI

determinations for all individuals in the SDW; and its failure to provide

32

adequate notice to individuals potentially eligible for Title II benefits.  SSA

contends that the State lacks standing to assert this claim against the

federal government, and that the claim is without merit under *Matthews v.*

*Eldridge*, 424 U.S. 319, 335 (1976) in any event.

The *parens patriae* doctrine traditionally allowed a sovereign to

represent the interests of citizens who were unable to represent

themselves.  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592,

600 (1982).  In American jurisprudence, a State's *parens patriae* standing

depends on the existence of an injury to its own "quasi-sovereign"

interests, which are independent from the injury to its citizens.  *Id*. at 601.

Such quasi-sovereign interests include those in the health and welfare of

State citizens and in ensuring citizens receive the full benefit of federal

programs.  *Id*. at 607.

An interesting wrinkle in the development of the *parens patriae*

doctrine - and one of critical importance here - has been the issue of

whether a State may assert a *parens patriae* claim against the federal

government.  In *Massachusetts v. Mellon*, 262 U.S. 447 (1923), the

Supreme Court answered that question negatively in the context of a State

challenge to the constitutionality of a federal appropriations bill, stating:

> We need not go so far as to say that a state may never intervene by suit to protect its citizens against any form of enforcement of unconstitutional acts of Congress.... [However, i]t cannot be conceded that a state, as parens patriae, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof. While the state, under some circumstances, may sue in that capacity for the protection of its citizens ..., it is no part of its duty or power to enforce their rights in respect of their relations with the federal government. In that field it is the United States, and not the state, which represents them as parens patriae, when such representation becomes appropriate; and to the former, and not to the latter, they must look for such protective measures as flow from that status.

*Id*. at 485-86; *see also South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966) (finding State had no standing to assert its citizens' due process rights in attempting to enjoin enforcement of federal discrimination statute). Subsequently, in *Alfred L. Snapp & Son*, 458 U.S. at 610 n.16, the Court stated this proposition more broadly, when it indicated in dicta, "[a] state does not have standing as parens patriae to bring an action against the Federal Government."  However, this dicta was seemingly disregarded in the recent case of *Massachusetts v. E.P.A.*, 549 U.S. 497 (2007), where, over a strong dissent, the Supreme Court permitted Massachusetts standing to enforce federal rights against a federal agency based partially upon the State's quasi-sovereign interest in the health and welfare of its

citizens. *Id*. at 520 n.17.  Further, a series of lower court opinions have allowed States to bring suits *parens patriae* against the federal government where enforcement of a federal right is sought, rather than the avoidance of a federal statute- as was the case in *Mellon*.  *See Puerto Rico Pub. Hous. Auth. v. U.S. Dep't of Hous. and Urban Dev*., 59 F. Supp. 2d 310, 326 (D. P.R. 1999); *Kansas v. United States*, 748 F. Supp. 797, 802 (D. Kan. 1990); *Abrams v. Heckler*, 582 F. Supp. 1155, 1159 (S.D.N.Y. 1984); *City of New York v. Heckler*, 578 F. Supp. 1109, 1122-25 (E.D.N.Y. 1984); *see also Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980) (stating, in case decided before *Alfred L. Snapp*, that New York has *parens patriae* standing to sue Census Bureau; no discussion of *Mellon*).  Thus, the weight of the caselaw indicates that a *parens patriae* claim seeking to compel federal compliance with federal law is permissible where a State's independent quasi-sovereign interest is implicated.

In the present instance, New York does not seek to enjoin enforcement of an act of Congress - as was prohibited in *Mellon* - through its *parens patriae* due process claim.  Rather, it permissibly seeks only to vindicate its citizens' due process rights to procedurally adequate retroactive Title II determinations through 42 U.S.C. § 405(g).  Further,

SSA's failure to make proper Title II eligibility determinations undoubtably implicates the State's independent quasi-sovereign interest in the health and welfare of its citizens and their receipt of federal benefits.[9]  Finally, it is likely that many individuals wrongfully denied Title II benefits will be unable to act on their own behalf, as SSA's erroneous Title II denials go back decades and affect thousands.  Thus *Mellon* and progeny do not bar New York's *parens patriae* claim, and the court finds that New York has standing to assert such a claim against SSA.  *See, e.g., Heckler*, 578 F. Supp. at 1122-23.

SSA's contention that this claim fails an application of the *Eldridge* factors must also be rejected.  Under *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976), courts analyze due process claims by weighing: 1) the private interest at stake; 2) the risk of an erroneous deprivation of that interest from the challenged procedures;  and 3) the government interest in adhering to its procedures.  *See Conn. Dep't of Soc. Servs.,* 428 F.3d at 147.  Here, SSA contends that the private interest at issue is small, as individuals have little financial interest in receiving Title II benefits in lieu of SSI and SSP.  It

---

[9]This injury to the State's quasi-sovereign interests is distinct from the State's entirely sovereign interest in the estimated billions of dollars in overpayments it made to its citizens as a result of SSA & HHS's errors, which provides the State standing to pursue its other claims.

is further asserted that SSA has a strong interest in following existing procedures for addressing the SDW, and that there is little risk of erroneous deprivation because SSA sends out multiple notices requiring those in the SDW to reapply for Title II benefits.

It would seem that SSA has overlooked aspects of the State's due process claim.  The complaint alleges that certain retroactively Title II eligible individuals are not being included in the SDW at all.  (*See, e.g.,* Compl. at ¶¶ 60, 64 and pp. 41-43 ; Dkt. No. 1.)  Clearly, these individuals are not receiving any notice of potential retroactive Title II eligibility, and are correspondingly not being assessed for or awarded such benefits. However small the interests in such benefits may be, they are not so small as to permit deprivation without any procedure whatsoever.  Nor does SSA have an interest in complying with its current procedures if such procedures are resulting in the denial of Title II benefits for numerous individuals without any notice or individualized assessment.  Accordingly, the court declines to dismiss the State's *parens patriae* due process claim at the current juncture.

## IV.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the defendants' motion to dismiss is granted in part and denied in part as follows:

(1)     for the reasons stated in Part B, the motion to dismiss the State's claims against SSA for violations of the Administrative Procedure Act and failure to fulfill statutory obligations (Claims 1 & 2) is granted only insofar as the State seeks recovery of administrative fees paid pursuant to the 1616 agreement, and is otherwise denied;

(2)     for the reasons stated in Part C, the motion to dismiss the State's claims against HHS for violations of the Administrative Procedure Act and failure to fulfill statutory obligations (Claims 3 & 4) is granted, except insofar as the State seeks an order enjoining HHS from the further collection of retroactive Part B premiums;

(3)     for the reasons stated in Part D, the motion to dismiss the State's claim for breach of fiduciary duties (Claim 5) is granted as to HHS and denied as to SSA;

(4)     for the reasons stated in Part D, the motion to dismiss the State's claim for breach of contract (Claim 6) is granted;

38

(5)   for the reasons stated in Part E, the motion to dismiss the

State's *parens patriae* claim (Claim 7) is denied; and it is further

**ORDERED** that the Clerk of the Court provide copies of this Order to

the parties by regular mail.

**IT IS SO ORDERED.**

Albany, New York
Dated: June 22, 2009

_____
United States District Court Judge